**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BYRDELL WALTON; | ) | |
| WADIE MOREHEAD; and | ) | |
| LOUISE MASON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| | ) | |
| MARK S. DIAMOND; MATTHEW | ) | |
| FEFFERMAN; UNITED RESIDENTIAL | ) | |
| SERVICES & REAL ESTATE, INC.; URBAN | ) | |
| FINANCIAL GROUP, INC.; REVERSE | ) | |
| MORTGAGE SOLUTIONS, INC., HARBOR | ) | |
| FINANCIAL GROUP, LTD.; UNITED | ) | |
| CONSTRUCTION SERVICES OF AMERICA; | ) | |
| DENNIS BOTH: ABLE TITLE INSURANCE | ) | |
| AGENCY, INC.; SHAUN DONOVAN, Secretary, | ) | |
| U.S. Department of Housing and Urban | ) | |
| Development; UNITED STATES DEPARTMENT | ) | |
| OF HOUSING & URBAN DEVELOPMENT, | ) | |
| MORTGAGE ELECTRONIC REGISTRATION | ) | |
| SYSTEMS, INC.; and UNKNOWN ASSIGNEES, | ) | **JURY DEMANDED** |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

## INTRODUCTION

1.      Plaintiffs, three elderly homeowners, bring this action against a reverse mortgage

lender, an unlicensed mortgage broker and home repair contractor, and others, seeking rescission

of their mortgages pursuant to the Truth In Lending Act, and to secure redress for consumer fraud,

discrimination, and other predatory practices.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction under the federal Truth In Lending Act, 15 U.S.C. §1601 *et seq.* and the Civil Rights Act, 42 U.S.C. § 1981. The Court has supplemental jurisdiction over plaintiffs' state-law claims pursuant to 28 U.S.C. §1367.

3.     All defendants transact business in the District and/or reside here, and the transactions at issue occurred here, and therefore venue is appropriate in this District.

## PARTIES

4.     Plaintiff, Byrdell Walton ("Walton") is 85 years old and lives on a fixed income in a home that she owns at 1316 S. Tripp in Chicago.

5.     Walton is African-American. Her home is located on the West Side of Chicago in the predominantly African-American community of Lawndale.

6.     Plaintiff Wadie Morehead ("Morehead") is 73 years old and lives on a fixed income in a home that she owns at 1507 N. Lockwood in Chicago.

7.     Morehead is African-American. Her home is located on the West Side of Chicago in the predominantly African-American community of Austin.

8.     Plaintiff Louise Mason ("Mason") is 79 years old and lives on a fixed income in a home that she owns at 822 N. Avers in Chicago.

9.     Mason is African-American. Her home is located on the West Side of Chicago in the predominantly African-American community of East Garfield Park.

10.     Defendant Mark S. Diamond ("Diamond") is an individual residing in Chicago, Illinois. He is a mortgage broker and home improvement contractor, operating in both capacities without a license. Diamond is the President and Secretary of United Residential Services & Real Estate, Inc. ("United"), and acted on its behalf in all dealings with plaintiffs. He may be found

either at United's address at 2355 North Damen, Chicago, Illinois 60647, or at 360 East Randolph Street, #3604, Chicago, Illinois, 60601.

11.     Defendant United Residential Services & Real Estate, Inc. ("United") is an Illinois corporation, not in good standing, with principal offices at 2355 N. Damen Avenue in Chicago. United is or was a home repair and remodeling contractor and a general contractor. Its registered agent is Joseph R. Ziccardi, 20 North Clark Street, Suite #1100, Chicago, Illinois, 60602.

12.     United Construction of America, Inc. ("UCA") is an Illinois corporation engaged in the home improvement business. Its office is located at 2355 North Damen Avenue, 1st Floor South, Chicago, IL 60647. Its registered agent and office are Stephen M. Alderman, 223 West Jackson Boulevard, Suite 1010, Chicago, IL 60606. UCA's president is Terry Diamond, the brother of Mark Diamond.

13.     Defendant Harbor Financial Group, LTD ("Harbor") is an Illinois corporation not in good standing. Harbor is or was a residential mortgage broker, but the Illinois Department of Financial and Professional Regulation revoked its license on April 27, 2010. Its registered agent is Matthew Fefferman, 885 River Oaks Drive, Calumet City, Illinois, 60409. Fefferman is also Harbor's president and, on information and belief, its sole owner.

14.     Defendant Matthew Fefferman ("Fefferman") is the president and owner of Harbor. He may be found at 1919 Spruce Circle, Munster, Indiana, 46321.

15.     On information and belief, Diamond and Fefferman are cousins. In plaintiffs' transactions, Fefferman knowingly allowed Diamond to broker loans in the name of Harbor, even though Diamond was not a registered loan officer or licensed mortgage broker. On occasion, Diamond has used the fictitious name "Mark Fefferman" in an attempt to elude identification of himself as the perpetrator of fraud.

16.     During the course of his dealings with plaintiff Walton, Diamond also represented that he owned a home repair company called Marmat Construction.   There is no corporation registered by that name in the state of Illinois.   However, Fefferman is listed with the Illinois Secretary of State as the president of Marmat Enterprises, Inc.   On information and belief, the name "Marmat" refers to Mark Diamond and Matthew Fefferman.

17.     Defendant Urban Financial Group, Inc. ("Urban") is an Oklahoma corporation doing business in Illinois.   Urban is a reverse mortgage lender, with principal offices located at 8909 S. Yale Avenue, Tulsa, Oklahoma, 74137.   Urban also does business in Illinois and other states under the name "Reverse It!"   Its Illinois registered agent is National Registered Agents Inc., 200 West Adams Street, Chicago, Illinois 60608.    Urban is the originating lender and record mortgagee of each of the plaintiffs' mortgages that are the subject of this action.

18.     Defendant Reverse Mortgage Solutions, Inc. ("RMS"), is a Delaware corporation doing business in Illinois, with principal offices located at 2727 Spring Creek Drive, Spring Texas, 77373.   Its Illinois registered agent is Registered Agent Solutions, Inc., 901 S 2nd Street,  Suite 201, Springfield Illinois, 62704.   RMS is engaged in the business of mortgage servicing and is the servicer of each of the plaintiffs' mortgages.   On information and belief, RMS is also the holder of one or more of plaintiffs' mortgages and/or Notes, and therefore is named as a necessary party in connection with plaintiffs' rescission claims.

19.     Defendant Dennis Both is an Illinois licensed attorney.   He has been counsel to Mark Diamond for many years and personally participated in the fraudulent conduct as set forth in detail below.

20.     Defendant Able Title Insurance Agency, Inc. ("Able Title") is a title company located at 3006 W. Belmont Avenue, Chicago, Illinois  60618, and/or at 18W100 22nd Street

#102c, Oakbrook Terrace, IL 60181. Able Title's president and registered agent is Arthur J Kryzaniak at the same address. Able Title was registered as an Illinois corporation, but was involuntarily dissolved in October 2011. Able Title was Urban's closing agent in each of the plaintiffs' transactions.

21. The United States Department of Housing and Urban Development (HUD) is a record holder of the subject mortgages on plaintiffs' properties, and is therefore named as a necessary party.

22. Shaun Donovan ("Donovan") is Secretary of HUD, and is named in his official capacity only.

23. Mortgage Electronic Registration Systems Inc. ("MERS"), is a Delaware corporation doing business in Illinois, with corporate headquarters located at 1818 Library Street, Suite 300, Reston, Virginia. MERS' registered agent in Illinois is Genpact Registered Agent Inc., located at 1901 E. Voorhees Street, Suite C, Danville, Illinois, 61834. MERS is a record holder of the subject mortgages on plaintiffs' properties, and is therefore named as a necessary party.

24. Defendants "Unknown Assignees" are any other or additional entities that have or may, during the pendency of this lawsuit, acquire any interest in the plaintiffs' mortgage loans. Transfer of ownership interests in mortgage loans is not necessarily a matter of public record. Plaintiffs will learn through discovery whether there are any additional parties with interests in plaintiffs' loans.

**FACTS RELATING TO MARK DIAMOND'S ONGOING SCHEME**

25. Diamond and his companies have been sued numerous times in state and federal court by individual homeowners, the Illinois Attorney General, the Federal Trade Commission, and others for misconduct very similar to that which plaintiffs allege in this case. Past allegations

have included fraud, racial targeting, and taking money from customers to do home repairs then doing little, no, or substandard work.

26. Diamond has engaged in a pattern and practice of fraudulent and deceptive practices with respect to borrowers similar to the plaintiffs in this case. Over the past fifteen years, numerous consumers have filed complaints against Diamond in court and with federal, state, and local consumer protection agencies. *See, e.g.*, *Chavarin v. Diamond, et al*., 96 CH 04727 (Circuit Court of Cook County) (plaintiffs alleged that Diamond made misrepresentations, forged a check, and kept loan proceeds that were intended for the borrowers); *Hopson v. Diamond, et al.,* 00 C 5061 (N.D. Ill.) (elderly disabled woman alleged Diamond engaged in a fraudulent home improvement and lending scheme and fraudulently induced her to transfer property title to him); Blackwell v. Diamond, et al., 00 CH 06089 (Circuit Court of Cook County) (plaintiff alleged that after she refused to execute a mortgage with her husband, Diamond conspired with her husband to take her name off the title by means of forgery in order to fraudulently obtain the mortgage); *Thomas v. Diamond, et al*., 2001 CH 01958 (Circuit Court of Cook County) (plaintiff alleged that Diamond promised to arrange certain home repairs and instead forged a deed transferring title to Diamond); *First Union Home Equity v. Willis v. Diamond, et al*., 2001 CH 07000 (Circuit Court of Cook County) (elderly disabled homeowner in foreclosure alleged that Diamond and affiliated companies fraudulently solicited home improvements and a mortgage loan that the homeowner could not afford by deceiving him about the actual costs); *Harris v. Diamond*, *et al.*, 07 C 3552 (N.D. Ill.) (longtime homeowners alleged that Diamond fraudulently arranged a $354,000 mortgage, took $163,000 for home repairs, then gutted the property, demanded more money, required plaintiffs to obtain a mortgage in the amount of $500,000, and violated TILA and other consumer protection statutes); *Smith v. United Residential Services, et al.*, 10 C 5440 (N.D. Ill.) ;

*Buckner v. Urban Financial Group, et. al.*, 11 C 4686 (N.D. Ill.) (alleging facts and parties virtually identical to this action).

27.     In 2002, Diamond was sued in a joint action by the Federal Trade Commission and the Illinois Attorney General for similar deceptive conduct in *FTC v. OSI Financial Services, Inc. et al.*, 02 C 5078 (N.D. Ill.).  In that case, on or about December 2, 2003, Diamond agreed to the entry of a consent decree which provided that Diamond and his companies were permanently enjoined from making misrepresentations about the terms or costs of loans, including misrepresentations concerning the amount of cash disbursed from mortgage loans for home improvements, and from conducting any loan closings.  The consent decree also required that Diamond and his companies monitor their loan closings with the FTC.

28.     Diamond and his companies' conduct in the transactions which are the subject of this action violated the terms of the consent decree.

29.     On September 15, 2009, the Illinois Attorney General filed a complaint for an injunction against Diamond.  The case is currently pending in the Circuit Court of Cook County. The complaint alleges that Diamond, OSI (his former mortgage brokerage), United, and various other Diamond affiliates have committed mortgage and home repair and remodeling fraud.  At least 36 consumers have filed complaints against defendants with the Illinois Attorney General in connection with this action.  *People of the State of Illinois v. Diamond, et al*., 2009 CH 33398 (Circuit Court of Cook County).

30.     The Attorney General's complaint further alleges that Diamond defrauds consumers by misrepresenting their rights, informing them that they cannot use their loan proceeds to hire other home repair companies, and retaining funds intended for repairs.  Diamond's conduct locks the consumers into home repair contracts with Diamond and his affiliates.  The written contracts,

where they exist, do not specify the work to be done, itemize the cost of the work and the types of materials to be used, or specify the disbursement of loan proceeds. Furthermore, the AG's complaint alleges, Diamond and his affiliates do not complete performance of the contract, and the work done is shoddy and unprofessional. See *People v. Diamond, et al*., 2009 CH 33398 (Circuit Court of Cook County).

31. Diamond's conduct in the transactions which are the subject of this action is similar to the conduct alleged in the Illinois Attorney General's Complaint.

32. Diamond and the companies he controls have a decades-long pattern and practice of targeting minority homeowners (especially elderly, African-American homeowners on Chicago's south and west sides), soliciting them in person through deceptive door-to-door sales techniques for mortgage products and overpriced home repair work that they do not need or cannot afford, and then doing incomplete, shoddy and defective work.

33. The common actor in all of these separate transactions and schemes, whenever they are perpetrated and under whatever company name, is Mark S. Diamond. Past and current companies controlled by him include OSI Financial Services, Inc. ("OSI"), Diamond Remodeling Lumber & Supply Co., United Construction of America, Inc., United Residential Services & Real Estate, Inc.,  Skyway Builders' #1, Harbor Financial, and TGA Development.

34. Diamond formulated, directed, controlled, managed, actively participated in the day-to-day activities and at all times had knowledge of the acts and practices of defendant United and UCA.  Diamond was and is United and UCA's alter ego.  There was and is a unity of interest between United/UCA and Diamond.

35. In each of the transactions at issue in this case, Diamond formulated, controlled, managed, and actively participated in the day-to-day activities and at all times had knowledge of the acts and practices of defendant Harbor.

36. In the transactions at issue in this case, Fefferman allowed Diamond to act on behalf of Harbor, knowing of his pattern of fraudulent conduct.

37. Under these circumstances, to adhere to the fiction of separate existence of United, UCA, and Diamond, or of Harbor, Diamond and/or Fefferman, would serve to sanction fraud and to promote unjust and inequitable consequences.

## FACTS RELATING TO MULTIPLE CLAIMS

### PLAINTIFF BYRDELL WALTON

38. Plaintiff Byrdell Walton has lived in her home for approximately fifty years. The property is a three-flat apartment building.

39. Walton's husband maintained the property himself, until he passed away in 1999. The Waltons paid off the mortgage on their home long ago.

40. In 2010, Walton needed some minor repairs done on the property, including repairing a few loose windows and the ceiling in her sun porch. She had seen a television advertisement for reverse mortgages, and learned that this was a way she could possibly finance the repairs.

41. Around the same time, Walton received a phone call from someone named Cynthia who talked to her about a reverse mortgage and home repairs. Cynthia offered to come out to Walton's home to discuss it further. She made an appointment and a day or two later, Cynthia came out along with another woman who didn't say very much.

42.     Walton told Cynthia what work she wanted done and Cynthia said that her boss, "Mark," could get it all done with his home improvement company, United.  She said he was "nice people" and told Walton that they did good work and everything that needed to be done could be financed with the reverse mortgage.  Cynthia stated that "Mark" would be able to explain more specific details about the reverse mortgage.

43.     Cynthia gave Walton a paper with the name of Harbor Financial Group.  Cynthia circled a line on this sheet of paper that mentioned "government programs available."

44.     Walton signed some papers during the first meeting with Cynthia.  However, she did not get copies and does not know what she signed.

45.     A short time later, Mark Diamond visited Walton's home with a man who said he was a lawyer.  On information and belief, this was defendant Dennis Both.  Mark was identified as the contractor who was supposed to do the work.

46.     On one or more occasions, while dealing with Walton, Diamond referred to himself as "Mark Fefferman."

47.     Walton signed some papers proffered to her by Diamond, but she did not get a copy of whatever she signed.

48.      Some time a week or two later, photocopies of apparently signed and notarized documents were mailed or delivered to Walton's home.

49.     These documents reflect a reverse mortgage to Urban Financial Group dated September 10, 2010, notarized by defendant attorney Dennis Both.  The documents were not notarized in Walton's presence.  The filled-in handwritten dates of "9/10/10" in the documents are in Dennis Both's handwriting.

50.    The documents reflect an initial draw in the amount of $49,852.50, including $2,218.26 in closing costs.

51.    Harbor is listed as the mortgage broker in the loan documents.  Harbor is said to have  received $772.95 in various loan origination fees, including a discount or credit in the amount of $849.32 off of the total broker's origination fee.

52.    On information and belief, Diamond intentionally kept Harbor's origination fees relatively low, to make it appear that the loan closing costs to Walton were reasonable.  Diamond, Fefferman, and Harbor charged low broker fees because they were planning to steal the bulk of the loan proceeds without providing commensurate benefit to Walton.

53.    On information and belief, Urban paid $849.32 to Harbor as "broker compensation," or a kickback for obtaining the loan on terms favorable to Urban.

54.    A HUD-1 Settlement Statement issued in connection with the transaction identifies the closing agent as Able Title Insurance Agency, Inc. and the place of settlement as Able's offices at 3006 W. Belmont Ave., Chicago, IL.   However, Walton never went to Able on September 10, 2010, or any other date.

55.    No employee or representative of Able Title was present at any time when Walton signed documents.

56.    Pursuant to the HUD-1 Settlement Statement, Walton was supposed to receive $47,634.24 "cash to borrower" from the loan proceeds.

57.    No one ever explained to Walton that she was supposed to receive a $47,634.24 "cash out" from the reverse mortgage .  She did not receive a check in that amount or any money from the reverse mortgage.

58.     On information and belief, based on the fact that Walton never received the loan proceeds check, and based on Diamond's pattern and practice in other similar cases, Diamond obtained the loan check intended for Walton, fraudulently endorsed the check, and deposited or cashed the check without Walton's knowledge.

59.     No one asked Walton how she would prefer to have the loan proceeds check delivered.  No one asked her if she wanted the check to be direct deposited into her bank account.

60.     In the loan documents Walton received well after the closing, there is a page with her apparent signature on it that says she does not want direct deposit, and another that says she will pick up the check at "United."   However, Walton is completely unfamiliar with these documents and does not even know what United is or where it is located.  She never agreed or authorized her loan check to be delivered to United or to Diamond.

61.     The handwriting inserting the name "United" on this document is that of defendant Dennis Both.  On information and belief, Dennis Both knowingly completed this document in order to further the scheme to divert Walton's loan proceeds to Diamond.

62.     Because she has no copies of documents relating to the construction contract, if there is one, Walton does not know if this "United" is United Residential Services & Real Estate, or United Construction of America, both of which are Diamond alter ego corporations.

63.     On information and belief, Able Title disbursed and delivered the loan proceeds to Diamond, without actually obtaining Walton's authorization to do so.

64.     Prior to signing the papers in her home, no one told Walton that she was supposed to receive homeowner counseling for the reverse mortgage.  She does not recall having any kind of counseling before she signed the documents.

65.     Walton did not understand, and no one explained to her, any of the terms of the reverse mortgage loan before or at the time she signed documents.

66.     Walton did not timely receive any of the disclosures of finance terms required by the Truth In Lending Act, 15 U.S.C. 1501 *et seq.* ("TILA").

67.     No one told Walton before or when she signed the reverse mortgage papers that she had three days to cancel if she changed her mind.

68.     When she signed the documents, Walton did not receive any copies of the 3-day notice of right to cancel required by TILA.

69.     By the time she received copies of the loan documents, it was more than three days after they had been signed, and Diamond already had her $47,634.24 "cash to borrower" in his hands, without her knowledge.

70.     On  October 8, 2010, a reverse mortgage dated September 10, 2010, identifying Urban Financial as lender and MERS as nominee mortgagee was recorded with the Cook County Recorder of Deeds, as Document No. 1028156026.

71.     On October 8, 2010, a reverse mortgage dated September 10, 2010, granting a security interest in the property to HUD as mortgagee was recorded with the Cook County Recorder of Deeds, as Document No. 1028156027.

72.     After the papers were signed, Diamond and Walton discussed the anticipated repairs to the property, including flooring around the toilets in the second and third floor bathrooms, separating the heating units for the three floors, replacing a couple of windows in the sun porch, and installing kitchen cabinets.  During this conversation, Diamond appeared to be telling Walton what he would do, instead of Walton telling him what work she wanted to be done.

73.     Walton's understanding, based on her conversations with Diamond and Cynthia, was that the repairs would be paid for out of the reverse mortgage, and she would not have to pay anything out of her own pocket.

74.     No one ever told Walton how much the repairs would cost.  She did not receive, and is unaware of having signed, any contract for home repairs or home improvements.

75.     A few days after Walton signed the papers, Diamond came back with another man, and they walked around the house with some kind of list talking about the repairs that he was going to do.  Walton did not see the list or ever get a copy of it.

76.      Diamond came back with two workmen to start the repairs.   They walked around the house outside talking about the work to be done.  The men began working shortly after that. After a few weeks, however, the work slowed down.

77.     Walton called Diamond several times to inquire about when the work would be done and to complain about things the workers were tearing up and leaving unfinished.  Diamond once told Walton the workers forgot.  Diamond later scheduled other times when the workers were supposed to come to finish the work, but they did not show up.

78.     One time, Diamond himself stood on Walton's fence, bending and breaking it, while he slapped some yellow paint around the outside of the windows.

79.     Several months later, in December 2010, when her complaints to Diamond went unanswered, Walton's brother-in-law, Bertrand, placed a phone call to Diamond, to talk about the work that still was not done.  Bertrand wrote up a work schedule setting out what was discussed. To this day, Walton never received anything in writing from Diamond and/or his subcontractors regarding the specific repairs or how much they cost.

80.     The work done by Diamond and/or his subcontractors is defective as follows.

a.      The contractor installed vinyl siding on the enclosed back porch, but numerous nails are protruding through the interior walls.

b.      The contractor separated the heating system for the three units, and installed two new forced air furnaces (Walton's unit still has radiators), but they did not build an enclosure around the new furnaces as they were supposed to do.  The new heating system does not work, and the second floor does not have a gas shut-off valve.  The contractor left several open vents and air return holes on the second and third floors, and the vents were not all connected to the new furnaces, although the walls were closed up around the ducts.  A light fixture was left hanging by its wires.  The workers left broken pieces of concrete and trash at the bottom of the basement stairs.  The basement floor drains were left clogged with sand and dirt from the construction debris.  The floor tile in the bathrooms was not replaced as requested.  Walton was told she would get a new wrought iron fence, but it was never installed.

c.      The last thing workers did before work completely stopped was to stain and/or varnish the stairs leading to the basement, in February 2011.  However, on information and belief, the contractor used the wrong materials on the stairs, because they are sticky and a strong odor emanates from the stairs, irritating Walton's asthma.  In fact, Walton did not want the stairs to be stained or varnished, she merely wanted the carpet to be cleaned instead.

81.     Despite many complaints, the workers stopped coming after February 2011, and Diamond stopped returning any of Walton's calls.  In April 2011, one of the workers came to Walton's house and told her that Diamond owed him some money and that he had not gotten paid for work he did on her house.

82.     In June, 2011, Walton received notice of a contractor's lien recorded against her property by Contractors Lien Services, Inc., on behalf of Diamond's subcontractor Stephan Slavov, in the amount of $7,132.33.   According to Slavov, he had a contract in the amount of $12,500, and Mark paid him only $5,500.   Walton is not aware of this contract and has not seen any written contract for work on her house.

83.     Pursuant to the loan documents, Urban required only minimal repairs necessary to bring the property into compliance with HUD standards, specifically, "scrape and paint window frames, garage exterior and some interior walls," and $1,027.50 was set aside for these required repairs.

84.     However, Diamond never had these particular repairs done, causing Walton to be in technical default of the loan terms.   She later received a notice from the lender regarding this default.  On information and belief, the $1,027.50 set aside for these repairs was never disbursed by Able Title.   In the alternative, on information and belief, Diamond applied for and received these funds even though the work was not done.

85.     The work that was done to Walton's property has little or no value, and she was required to retain other contractors to complete and correct the work.

86.     Even though he never finished the work as promised, Diamond would come to Walton's house, bringing food and "sweet talking" her in an attempt to distract her from the work that was supposed to be done.

87.     This whole ordeal has caused Walton actual damages, including lost home equity in excess of $46,000, extreme emotional distress, aggravation and inconvenience.   She was also unable to rent out the upstairs apartments as a result of the unfinished work.

## PLAINTIFF WADIE MOREHEAD

88.     Plaintiff Wadie Morehead ("Morehead") has lived in her home since 1982.  Prior to the events described below, there was no mortgage on the property.

89.     On or about April 1, 2010, a woman named Cynthia came to Morehead's home just as she was coming home from church.

90.     Cynthia asked Morehead if she was interested in having any work done on her home and stated that she could help Morehead get a reverse mortgage to pay for the cost of such work.

91.     Morehead had been considering building a new addition on the house for a den. Morehead was somewhat familiar with reverse mortgages, but did not really know or understand how they worked. Cynthia told Morehead that her boss, Mark, would explain the reverse mortgage part of the transaction.

92.     Several days later, Cynthia returned to Morehead's home with Mark Diamond. Diamond looked around the property and stated that the City of Chicago would approve an addition to the home, and that she would not have any problem getting a reverse mortgage.

93.     Morehead had previously had her property appraised in 2009, with a value of $250,000.  She gave Diamond her only copy of that appraisal report, which he never returned.

94.     Diamond told Morehead that the addition would cost $55,000, and asked her to sign some documents.  At this time, Morehead had not made up her mind to enter into a construction contract or a reverse mortgage, and told Diamond she did not want to sign any binding contracts

yet. He told her that these documents merely indicated she was interested in looking further into a reverse mortgage.

95.     Diamond told Morehead that under the reverse mortgage, she could live in the home until she dies. Morehead told Diamond that she was concerned that, with a reverse mortgage, her children would not be able to inherit the family home.

96.     Diamond did not explain that often in a reverse mortgage, by the time the borrower dies and the loan becomes due, the amount owed is far more than the house is worth, making it impossible or impractical for the heirs to keep the home after the death of the borrower.

97.     Instead, Diamond told Morehead that she could obtain insurance that would pay off the reverse mortgage when she died, so the home could be passed down to her children. He had her sign some documents supposedly for this insurance, but later told her she did not qualify because of health issues.

98.     On or about April 21, 2010, Diamond returned to Morehead's home with a man he identified as an attorney. On information and belief, this was attorney Dennis Both. Another young man was present who was identified as Diamond's brother-in-law, a notary. Diamond presented Morehead with numerous documents to sign. While she was signing these papers, the attorney just stood there and acted snobbish and appeared to be in a hurry to leave.

99.     Morehead tried to read the documents before signing them, but Diamond rushed her through the signing, telling her "this is not important" and "you just have to sign to make it legal."

100.    Diamond, Dennis Both, and the young notary left with all of the documents Morehead had signed. They did not leave her copies of anything.

101. On June 9, 2010, a reverse mortgage dated April 21, 2010, identifying Urban Financial as Mortgagee was recorded with the Cook County Recorder of Deeds, as Document No. 1016056053.

102. On June 9, 2010, a reverse mortgage dated April 21, 2010, granting a security interest in the property to the U.S. Department of Housing and Urban Development as mortgagee was recorded with the Cook County Recorder of Deeds, as Document No. 1016056054.

103. Prior to signing the papers in her home, no one told Morehead that she was supposed to receive homeowner counseling for the reverse mortgage. She does not recall having any kind of counseling before she signed the documents.

104. About week or two later, Diamond brought copies of some documents to Morehead.

105. These documents reflect a reverse mortgage to Urban Financial Group dated April 21, 2010.

106. Although Diamond had introduced his "brother-in-law" to Morehead as a notary, the mortgage was notarized by defendant attorney Dennis Both. The document was not notarized in her presence. The filled-in handwritten date of "4/21/10" is in Dennis Both's handwriting.

107. The documents reflect an initial draw in excess of $100,000.

108. When she signed the second set of papers, Morehead believed she was agreeing to hire Diamond to build a room addition for $55,000, to be paid for with a reverse mortgage. However, when she received the documents from Diamond, weeks after she had signed everything, she saw that the loan amount was over $100,000.

109. A HUD-1 Settlement Statement issued in the transaction identifies the closing agent as Able Title Insurance Agency, Inc. and the place of settlement as Able's offices at 3006 W.

Belmont Ave., Chicago, IL. However, Morehead never went to Able Title on April 21, 2010, or any other date.

110.     Harbor is listed as the mortgage broker in the HUD-1 Settlement Statement. Harbor appears to have received $641.00 in various loan origination fees, including a "credit" or discount in the amount of $3,338.03 off of the total broker's origination fee.

111.     On information and belief, Diamond intentionally kept Harbor Financial's origination fees relatively low, to make it appear that the loan closing costs to Morehead were reasonable. Diamond, Fefferman, and Harbor charged low broker fees because they were planning to steal the bulk of the loan proceeds without providing commensurate benefit to Morehead.

112.     In the alternative, on information and belief, Urban paid $3,338.03 to Harbor as "broker compensation," or a kickback for obtaining the loan on terms favorable to Urban.

113.     Pursuant to the HUD-1 Settlement statement, Morehead was supposed to receive $100,577.81 from the loan proceeds. Morehead never received a check from the loan proceeds and was not aware that a check had been delivered to Diamond on or about April 26, 2010, immediately following three days after the closing date.

114.     On information and belief, based on the fact that Morehead never received the loan proceeds check, and based on Diamond's pattern and practice in other similar cases, Diamond obtained the loan check intended for Morehead, fraudulently endorsed the check, and deposited or cashed the check without her knowledge.

115.     Able Title disbursed and delivered the loan proceeds to Diamond, without actually obtaining Morehead's authorization to do so.

116.    Diamond later told Morehead that he had indeed received the $100,577.81, that the work would cost $55,000, and most of the rest of the loan amount was paid for "insurance and fees."  He then gave Morehead $8,000 or $9,000 "to pay some bills."

117.    At the time of the transaction, Diamond told Morehead that he would get the building permits, and the work would start in June and be finished in July 2010.   However, no work was started until July 2011, more than a year after Diamond had received the loan proceeds.

118.    While waiting for the work to begin, Morehead began to complain to Diamond about the delay.  Diamond blamed the delay on the city, stating that it took a long time to get city approval of the blueprints for the room addition.

119.    After some time, Diamond stopped answering Morehead's calls. On one occasion, when Morehead used a different telephone to try to reach him, he answered, and became angry when he found out she was calling him from a number he did not recognize.

120.    Around Christmas, 2010, probably in response to her many calls, Cynthia came to Morehead and told her that the delay was the result of the city being slow to approve the building permits.

121.    In July 2011, Cynthia unexpectedly visited Morehead's home and told her that Diamond was "a crook" and that he was "not going to do anything for you."  Cynthia said she had a list of other victims, but asked Morehead not to tell Diamond she had been there, because "I need the job."

122.    In July 2011, a workman sent by Diamond came and did some work in the kitchen, installing some new laminate and repairing a "lazy-susan" cabinet.  However, the new cabinet front as installed is gouged and badly chipped.

123.    Morehead had not asked for work in the kitchen originally, but while he was in her home, Diamond had noticed a sagging cabinet and offered to have it repaired as part of the contract.

124.    In August 2011, the man who did the cabinet work came to Morehead and complained that he had not been paid, and threatened to record a lien against her property.

125.    Finally, in early September 2011, Diamond sent some workers to Morehead's home, ostensibly to begin building the room addition. The workers dug a long trench, approximately two feet wide and three feet deep, in the yard around the perimeter of the intended addition, purportedly for a foundation. No further work has been done to her home.

126.    Morehead never saw a building permit for the room addition. In November 2011, Diamond told Morehead that he had to wait for a city inspector to come out before he could do any further work. However, Morehead is not aware of any city inspectors visiting her home.

127.    Morehead did not understand, and no one explained to her any of the terms of the reverse mortgage loan before or at the time she signed documents.

128.    Morehead did not timely receive any of the disclosures of finance terms required by the Truth In Lending Act, 15 U.S.C. 1501 *et seq.* ("TILA").

129.    No one told Morehead before or when she signed the reverse mortgage papers that she had three days to cancel if she changed her mind.

130.    When she signed the documents, Morehead did not receive any copies of the 3-day notice of right to cancel required by TILA.

131.    By the time she received copies of the loan documents, it was more than three days after they had been signed, and Diamond already had her $100,577.81 "cash to borrower" in his hands, without her knowledge.

132.     Morehead has suffered actual damages including but not limited to the fact that she exchanged approximately $100,000 in home equity for nothing more than a hole in the ground. She has suffered extreme emotional distress, aggravation and inconvenience as a result of Diamond's conduct.

### PLAINTIFF LOUISE MASON

133.     Plaintiff Louise Mason  ("Mason") has lived in her home since 1976.  Prior to the events described below, there was no mortgage on the property.

134.     In approximately August 2010, Mason's basement flooded.

135.     Some time after the basement flooded, Mason was sitting on the front porch of her home when she was approached by a man named Mark Diamond who had been walking around the neighborhood.

136.     Diamond asked Mason if her home had flooded during the recent rains and asked if her basement had been damaged.  Mason told Diamond that her basement had flooded and that she needed to have it fixed.  Diamond told Mason that he was with a company called Harbor and that they could get Mason into a government program to fix her basement.

137.     Mason, Diamond, and a man named Paul Ross who was with Diamond  then went into Mason's home.  Mason showed them the damage to her basement.  Diamond and Ross told Mason they could fix her basement.  They told her that the work would cost around $1,500. Diamond took pictures of Mason's basement.

138.     Paul Ross is or was a mortgage loan originator with Harbor Financial.  However, Diamond and Ross never told Mason this.

139.     Mason told Diamond and Ross that she could afford a monthly payment and that she did not want to take out a mortgage on her home.  Diamond and Ross told Mason that "all that can be worked out."

140.     Diamond asked to see the rest of the home.  Mason showed Diamond and Ross her home.   Diamond took some pictures and commented on how big the home was.  Diamond and Ross also took pictures of the backyard.  Mason asked them why they wanted pictures of the whole house when they were only fixing the basement and they told Mason they needed pictures of the whole house in order to be able to work on her home.

141.     Diamond had Mason sign some papers during this meeting, but he did not let her read them nor did he give her a copy of them.  Diamond told Mason the papers would let them start the work on her basement.

142.     About a week or so later, Diamond and Ross came back to Mason's home. By this time, Mason's basement was starting to smell bad because of the flood damage.

143.     Diamond and Ross told Mason they would start the work on her basement during the next week and dumpster would be delivered on Monday.  They had Mason sign some papers, but did not let her read them.   They told her the papers were just to "give her consent to them starting the work on her basement."  Mason signed the papers as directed by Diamond and Ross.

144.     Less than a week later, a woman named Cynthia called Mason and told her she would pick her up and take her to Harbor's offices to complete the final papers they required to get her basement fixed.

145.     Cynthia picked Mason up at her home and drove Mason to an office near Damen and Fullerton Avenues in Chicago.  On information and belief this was the office of defendants United and/or UCA.

146.　Upon arriving at United/UCA's offices, Mason was led to room by a man named Matthew.

147.　On information and belief, "Matthew" is defendant Mathew Fefferman of Harbor Financial Group.

148.　Matthew had Mason sign some more papers.  Mathew told Mason that these were the final papers necessary to start work on her basement and that the work would begin  the next week.  Mathew did not let Mason read these papers and he did not give her any copies of them.

149.　After this meeting, Cynthia drove Mason back to her home.

150.　Prior to signing the papers, no one told Mason that she was supposed to receive homeowner counseling for the reverse mortgage.  She did not receive any kind of counseling before she signed the documents.

151.　On  September 15, 2010, a reverse mortgage dated September 2, 2010, identifying Urban Financial as lender and MERS as nominee mortgagee was recorded with the Cook County Recorder of Deeds as Document No. 1025850036 .

152.　On September 15, 2010, a reverse mortgage dated September 2, 2010, granting the U.S. Department of Housing and Urban Development a security interest as mortgagee was recorded with the Cook County Recorder of Deeds as Document No. 1025850037.

153.　Defendant attorney Dennis Both notarized both of these mortgages, which appear to bear Mason's signature.

154.　Dennis Both was not present when Mason signed any documents, and the documents were not notarized in her presence.

155.　The filled-in handwritten date of "9/2/10" in Mason's loan documents is in Dennis Both's handwriting.

156.     A HUD-1 Settlement Statement issued in the transaction identifies the closing agent as Able Title Insurance Agency, Inc. and the place of settlement as Able's offices at 3006 W. Belmont Ave., Chicago, IL.   Mason never went to Able on September 2, 2010, or any other date.

157.     On information and belief, no employee or representative of Able Title was present when Mason signed documents.

158.     Harbor is listed in the HUD-1 Settlement Statement as the mortgage broker in the transaction.

159.     Pursuant to the HUD-1 Settlement Statement, Harbor received $3,272.95 from the loan proceeds.

160.     On information and belief, Harbor also received broker compensation from Urban in the amount of $661.25, as a kickback for obtaining the loan on terms favorable to Urban.

161.     Pursuant to the HUD-1 Settlement Statement, Mason was supposed to receive $20,750.74 "cash to borrower" from the loan proceeds.   Mason received none of these proceeds.

162.     On information and belief, Able Title disbursed and delivered the loan proceeds to Diamond, without actually obtaining Mason's authorization to do so.

163.     None of the defendants ever performed or caused to be performed any work on Mason's home.

164.     Pursuant to the loan documents, Urban required only minimal repairs necessary to bring the property into compliance with HUD standards, specifically, $1,500 was set aside for these required repairs.

165.     However, Diamond never had these particular repairs done, causing Mason to be in technical default of the loan terms.   She later received a notice from the lender regarding this default.   On information and belief, the money set aside for these repairs was never disbursed by

Able Title.   In the alternative, on information and belief, Diamond applied for and received these funds even though the work was not done.

166.    Shortly after the meeting at United's offices, Mason realized that she had entered into a reverse mortgage and tried to cancel the whole transaction.

167.    On or before September 7, 2010, Mason called Matthew and told him she did not want a mortgage on her home and wished to cancel the transaction.  Matthew told her she was too late, but if she could come up with $24,000, they would cancel it.

168.    On or before September 7, 2010, Mason also called Diamond and told him she never wanted a mortgage on her home and wanted to cancel the transaction.  In response, Diamond called Mason a "crazy old lady" and told her it was too late to cancel.

169.    In fact, based on documents she received later, Mason had until midnight on September 7, 2010, to cancel the transaction in writing pursuant to TILA.

170.    By the time Mason received copies of the loan documents, it was more than three days after they had been signed, and Diamond already had her $20,750.74 "cash to borrower" in his hands, without her knowledge.

171.    On or about September 15, 2010, Mason called Reverse Mortgage Solutions, the mortgage servicer, and told them she never wanted a mortgage on her home and wanted to cancel the transaction.  The representative to whom Mason spoke told Mason that her cancellation had to be in writing.

172.    On or about September 15, 2010, Mason attempted to cancel the loan in writing, indicating that she had originally called to cancel before midnight on September 7th.

173.    Urban failed to honor Mason's notice of cancellation.

174.    Mason has suffered actual damages including but not limited to lost home equity in excess of $25,000.    She has also suffered extreme emotional distress, aggravation and inconvenience as a result of Diamond's conduct.

## COUNT I  --  TRUTH IN LENDING ACT  --  BYRDELL WALTON

175.    This Count is brought by Byrdell Walton against Urban Financial, RMS, MERS, Donovan and HUD only.

176.    Plaintiff incorporates paragraphs 1-24 and 38-87 above by reference herein.

177.

178.    Urban Financial regularly extends or offers to extend consumer credit for which a finance charge may be imposed or which is payable in four or more installments, and thus is a creditor within the meaning of TILA, 15 U.S.C. § 1602(f) and Regulation Z. §226.2(a)(17).

179.    The transaction at issue was entered into for personal family or household purposes, namely for home improvements.

180.    Because the transaction was secured by plaintiff's home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by TILA, 15 U.S.C. Sect. 1635 and 12 C.F.R. Sect. 226.23.

181.     On or about June 28, 2011, Walton by her counsel notified Urban Financial Group and the Department of Housing and Urban Development ("HUD") that she was exercising her extended right to rescind the mortgage pursuant to TILA.

182.    As of the date of filing this action, neither Urban nor HUD has taken any steps to release the recorded mortgages as required by TILA.

183.    Defendants' conduct violates TILA, entitling Walton to full rescission of the loan and $2,000 statutory damages.

WHEREFORE, Ms. Walton prays that this Court enter judgment in her favor and against the defendants, declare that the security interest arising out of the transaction is null and void, and award her actual and statutory damages, attorneys' fees, and costs of suit.

## COUNT II – TRUTH IN LENDING ACT – WADIE MOREHEAD

184.    This Count is brought by Wadie Morehead against Urban Financial, RMS, Donovan and HUD only.

185.    Plaintiff incorporates paragraphs 1-24 and 88-132 above by reference herein.

186.    Urban Financial regularly extends or offers to extend consumer credit for which a finance charge may be imposed or which is payable in four or more installments, and thus is a creditor within the meaning of TILA, 15 U.S.C. § 1602(f) and Regulation Z. §226.2(a)(17).

187.    The transaction at issue was entered into for personal family or household purposes, namely for home improvements.

188.    Because the transaction was secured by plaintiff's home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by TILA, 15 U.S.C. Sect. 1635 and 12 C.F.R. Sect. 226.23.

189.    On or about May 15, 2012, Morehead by her counsel notified Urban Financial Group and the Department of Housing and Urban Development ("HUD") that she was exercising her extended right to rescind the mortgage pursuant to TILA.

190.    As of the date of filing this action, neither Urban nor HUD has taken any steps to release the recorded mortgages as required by TILA.

191.    Defendants' conduct violates TILA, entitling Morehead to full rescission of the loan and $2,000 statutory damages.

WHEREFORE, Ms. Morehead prays that this Court enter judgment in her favor and against the defendants, declare that the security interest arising out of the transaction is  null and void, and award her actual and statutory damages, attorneys' fees, and costs of suit.

## COUNT III – TRUTH IN LENDING ACT – LOUISE MASON

192.    This Count is brought by Louise Mason against Urban Financial, MERS, Donovan and HUD only.

193.    Plaintiff incorporates paragraphs 1-24 and 133-174 above by reference herein.

194.

195.    Urban Financial regularly extends or offers to extend consumer credit for which a finance charge may be imposed or which is payable in four or more installments, and thus is a creditor within the meaning of TILA, 15 U.S.C. § 1602(f) and Regulation Z. §226.2(a)(17).

196.    The transaction at issue was entered into for personal family or household purposes, namely for home improvements.

197.    Because the transaction was secured by plaintiff's home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by TILA, 15 U.S.C. Sect. 1635 and 12 C.F.R. Sect. 226.23.

198.     On or about July 27, 2011, Mason by her counsel notified Urban Financial Group and the Department of Housing and Urban Development ("HUD") that she was exercising her extended right to rescind the mortgage pursuant to TILA.

199.    As of the date of filing this action, neither Urban nor HUD has taken any steps to release the recorded mortgages as required by TILA.

200.     Defendants' conduct violates TILA, entitling Mason to full rescission of the loan and $2,000 statutory damages.

WHEREFORE, Ms. Mason prays that this Court enter judgment in her favor and against the defendants, declare that the security interest arising out of the transaction is null and void, and award her actual and statutory damages, attorneys' fees, and costs of suit.

## COUNT IV – ILLINOIS CONSUMER FRAUD ACT

201.     Plaintiffs incorporate paragraphs 1- 174 above by reference herein.  This count is against Diamond, United, UCA, Fefferman, Both, Harbor, and Able Title, only (collectively "defendants").

202.     Pursuant to the Illinois Home Repair and Remodeling Act,  815 ILCS 513/1 *et seq* ("IHRRA"),

> "[i]t is the public policy of this State that in order to safeguard the life, health, property, and public welfare of its citizens, the business of home repair and remodeling is a matter affecting the public interest. The General Assembly recognizes that improved communications and accurate representations between persons engaged in the business of making home repairs or remodeling and their consumers will increase consumer confidence, reduce the likelihood of disputes, and promote fair and honest practices in that business in this State."

203.     The IHRRA provides, *inter alia*, that home repair and remodeling contracts must be in writing, with costs itemized and enumerated, and requires the contractor to provide a certain "Know Your Consumer Rights" brochure.  815 ILCS 513/1 *et seq*.

204.     The IHRRA (815 ILCS 513/30)  provides that "[a]ny person who suffers actual damage as a result of a violation of this Act may bring an action pursuant to Section 10a of the Consumer Fraud and Deceptive Business Practices Act.  (815 ILCS 505/10a)

205.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA")

provides that

> "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act."

206.    Pursuant to 16 C.F.R. Part 429 ("FTC Rule"), Federal Regulations provide that

> "in connection with any door-to-door sale, it constitutes an unfair and deceptive act or practice for any seller to: (a) Fail to furnish the buyer with a fully completed receipt or copy of any contract pertaining to such sale at the time of its execution . . .  which shows the date of the transaction and contains the name and address of the seller, and in immediate proximity to the space reserved in the contract for the signature of the buyer or on the front page of the receipt if a contract is not used and in bold face type of a minimum size of 10 points, a statement in substantially the following form:

> "You, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See the attached notice of cancellation form for an explanation of this right."
> * * *
>  (b) Fail to furnish each buyer, at the time the buyer signs the door-to-door sales contract or otherwise agrees to buy consumer goods or services from the seller, a completed form in duplicate, captioned either "NOTICE OF RIGHT TO CANCEL" or "NOTICE OF CANCELLATION,"  informing the consumer that they "may CANCEL this transaction, without any Penalty or Obligation, within THREE BUSINESS DAYS from the above date."

> (e) Fail to inform each buyer orally, at the time the buyer signs the contract or purchases the goods or services, of the buyer's right to cancel.

207.    This FTC Rule further provides that it is an unfair and deceptive act to

"[m]isrepresent in any manner the buyer's right to cancel."

208.     Section 2B of the ICFA similarly requires a notice of right to cancel within three days of signing a contract in the consumer's home.

209.     As described above, in the course of his trade or business, Diamond solicited plaintiffs and arranged for the reverse mortgage loans through Harbor and Urban, and for the home repair and remodeling work contract through his construction companies, United and/or UCA.

210.      Over the course of his personal visits to plaintiffs' homes before obtaining the reverse mortgages for them, Diamond persuaded plaintiffs to agree to much more work than they actually wanted.

211.     Consistent with his *modus operandi* in scores of other transactions, Diamond was so personable and pleasant that plaintiffs believed he was going to help them.  He quickly gained their trust and confidence.    He claimed United's remodeling work was top quality.   He enticed plaintiffs with promises of free "government programs," and lavish finishes.

212.     Consistent with his *modus operandi* in numerous other transactions, Diamond failed to provide plaintiffs with copies of written contracts, itemized contracts, and notices of consumer rights.

213.     On or about April 21, 2010, the same day as the closing of her reverse mortgage, Morehead appears to have signed a home repair and remodeling contract with Diamond and United in the amount of $55,000.00.

214.      Morehead did not receive a copy of the documents she signed at the time she signed them.

215.     Walton either never signed a home repair contract with Diamond, or if she signed one, she never received a copy.

216.    Mason either never signed a home repair contract with Diamond, or if she signed one, she never received a copy.

217.    Plaintiffs never received a copy of the "Know Your Consumer Rights" brochure that United was required to give them.

218.    Plaintiffs never received a written estimate of the cost of construction and repairs, as required by Illinois law.

219.    Plaintiffs never received a copy of the notice of right to cancel the construction contracts (if they signed one).

220.    Defendants have engaged in the conduct that constitutes unfair and deceptive acts and practices declared unlawful under the Home Repair Remodeling Act, 815 ILCS § 513/15, in that, in the course of advertising, offering for sale, selling and providing home repair and remodeling services to plaintiffs prior to executing of the contract, defendants, on information and belief, failed to, among other things, (a) provide to plaintiffs a copy of the "Home Repair:  Know Your Consumer Rights" pamphlet prior to the execution of any home repair and remodeling contract; (b) obtain a signed and dated acknowledgment form entitled "Consumer Rights Acknowledgment Form" from plaintiffs; and (c) sign and date the acknowledgment form, retain the original, and leave a copy with plaintiffs.

221.    As set forth above, defendants obtained substantial sums of money from the reverse mortgage loans without the knowledge or authorization of the plaintiffs, at all times intending not to perform as promised.

222.    Dennis Both participated in the unfair and deceptive conduct as a notary and not in his capacity as a lawyer (except insofar as he used his title as an attorney to give an aura of

legitimacy to the transaction), and therefore is subject to the Consumer Fraud Act for his conduct herein.

223.    Dennis Both engaged in unfair and deceptive conduct in violation of ICFA when he notarized documents without witnessing the signing and facilitated the execution of fictitious letters of direction, while knowing that Diamond intended to steal the equity in plaintiffs' homes.

224.    Defendants engaged in a course of conduct that constitutes unfair and deceptive practices when they knowingly used or employed deception to induce and encourage plaintiffs to enter into the reverse mortgages, promised performance which defendants did not intend to perform or knew would not be performed, and obtained plaintiffs' loan checks through intentional fraud and deception.

225.    After defendants failed to substantially perform as promised, they also failed to return plaintiffs' money.

226.    Defendants also made false statements to plaintiffs in an attempt to excuse their non-substantial performance.

227.    Defendants failed to employ the qualified personnel necessary to perform the home repairs.

228.    Defendants failed to comply with municipal, county, state and federal regulations or codes relating to the performance of home repair, including obtaining appropriate building permits.

229.

230.    In addition to being deceptive, defendants' practices violate public policy, are immoral, unethical, oppressive or unscrupulous, and substantially harm consumers like plaintiffs.

231.    Defendants' conduct constitutes a violation of ICFA (815 ILCS 505/2), by engaging in unfair and/or deceptive acts and practices and conduct toward plaintiffs.

232.    Defendants and their agents/co-conspirators profited from their fraud, deception, discrimination and/or negligence.

233.    Defendants were unjustly enriched by their conduct.

234.    Defendants engaged in such conduct in the course of trade and commerce.

235.    Defendants engaged in such conduct with the intent that plaintiffs rely on their deception.

236.    Defendants engaged in such conduct with the intent to injure plaintiffs.

237.    Plaintiffs have been damaged as a result and continue to be damaged.

238.    Defendants' conduct caused plaintiffs' injuries.

239.    Pursuant to ICFA, 815 ILCS 505/10a, plaintiffs are entitled to actual damages, punitive damages, and attorneys' fees and costs.

WHEREFORE, plaintiffs request that the Court enter judgment in their favor and against defendants for actual damages; equitable relief; disgorgement of profits; punitive damages; attorney's fees, litigation expenses and costs; and such other or further relief as the Court deems appropriate.

## COUNT V - CIVIL RIGHTS ACT

240.    Plaintiff incorporates paragraphs 1-174 as if set forth fully herein.  This claim is against Diamond, Fefferman, Harbor, United, and UCA (collectively, "defendants").

241.    In connection with plaintiffs' loan, defendants purposefully discriminated against plaintiffs on the basis of race.  They targeted, singled-out and exploited plaintiffs because of their perceived vulnerabilities, including their race and age.

242.     Through marketing techniques and other practices, defendants had a policy of intentionally and disproportionately targeting African-Americans on the south and west sides of Chicago, like plaintiffs, with mortgage loans whose terms are less favorable than the terms given to similarly situated Caucasian borrowers, in violation of 42 U.S.C. § 1981. Diamond and Fefferman created and carried out these practices on behalf of Harbor and United/UCA.

243.     Through door-to-door marketing techniques and other practices, defendants had and have a policy of intentionally and disproportionately targeting African-Americans on the south and west sides of Chicago, like plaintiffs, with home repair contracts for incomplete, shoddy, defective and dangerous home repair work, in violation of 42 U.S.C. § 1981. Diamond, Fefferman, Harbor and United have a long-standing pattern and practice of such conduct that is documented in other lawsuits and in consumer complaints lodged with state and federal agencies.

244.     Plaintiffs were qualified for reverse mortgage loans and home repair contracts.

245.     But both the mortgage and construction contract transactions were arranged, granted and performed on grossly unfavorable terms to plaintiffs.

246.     Defendants arrange, grant and perform loans and home repair contracts on better terms for Caucasian borrowers.

WHEREFORE, the Court should award plaintiffs compensatory, punitive and other appropriate damages; equitable relief; attorney's fees and litigation costs; and such other or further relief as the Court deems appropriate.

## **COUNT VI – FAIR HOUSING ACT**

247.     Plaintiff incorporates paragraphs 1-174 by reference herein. This claim is against Diamond, Fefferman, Harbor, United, and UCA (collectively, "defendants").

248.    The Fair Housing Act ("FHA"), 42 U.S.C. § 3605, provides:

Discrimination in residential real estate-related transactions

(a) In general. It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) "Residential real estate-related transaction" defined. As used in this section, the term "residential real estate-related transaction" means any of the following:

(1) The making or purchasing of loans or providing other financial assistance--

(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or

(B) secured by residential real estate.

(2) The selling, brokering, or appraising of residential real property.

(c) Appraisal exemption. Nothing in this title prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status.

249.    In connection with their loan transactions, defendants impermissibly and intentionally discriminated against plaintiffs solely on the basis of plaintiffs' race, color and sex by targeting them for unconscionable financing and fraudulent, grossly overpriced home repair contracts paid from the reverse mortgages.

250.    The use of some other policy or practice would have satisfied any legitimate business need claimed by defendants.

251.    In the alternative, defendants targeted plaintiffs because of their perceived vulnerabilities, including their status as African-American, elderly and female.  In particular,

Diamond was aware that his policy and practices resulted in an adverse disparate impact on people like plaintiffs and did nothing to correct that.

252.    Pursuant to the Fair Housing Act, 42 U.S.C. §3613, plaintiffs have a private right of action for actual and punitive damages and injunctive relief.

WHEREFORE, the Court should award plaintiffs compensatory, punitive and other appropriate damages; equitable relief; attorney's fees and litigation costs; and such other or further relief as the Court deems appropriate.

## COUNT VII -- CIVIL CONSPIRACY

253.    Plaintiffs incorporate paragraphs 1-174 above by reference herein.

254.    This claim is brought against Diamond, Fefferman, Harbor, United, UCA, and Dennis Both ("defendants").

255.    Defendants, and each of them, conspired and agreed to steal the equity in plaintiffs' homes by fraudulently inducing them to sign reverse mortgages and thereafter obtaining the entire "cash out" loan proceeds without providing commensurate services in return.

256.    Defendants, and each of them, knew that Diamond and United and/or UCA had no intention of performing construction or home repairs worth anywhere near the amounts obtained from the reverse mortgages.

257.    Each of the defendants participated personally in the fraudulent conduct and/or furthered the scheme to steal plaintiffs' home equity, by, including but not limited to, (a) making direct misrepresentations to plaintiffs (Diamond and Fefferman); (b) misrepresenting the import and effect of documents when plaintiffs signed them (Diamond and Fefferman); (c) failing to provide copies of signed documents to plaintiffs until after their three-day cancellation period had

run (Diamond, Fefferman and Both); (d) remaining silent while other members of the conspiracy were making misrepresentations to plaintiffs (Dennis Both); (e) notarizing documents without observing the signing (Dennis Both); (f) facilitating the fraudulent transfer of loan proceeds (Dennis Both); (g) obtaining and fraudulently endorsing loan proceed checks without plaintiffs' knowledge (Diamond); (h) intentionally failing to perform the promised work, or causing substandard work to be performed (Diamond and United/UCA); and (i) failing to pay subcontractors who performed some work on clients' homes (Diamond and United/UCA), as set forth above.

258. On information and belief, defendants shared the fraudulently obtained loan proceeds.

259. Plaintiffs suffered damages as a result of defendants' fraudulent conspiracy.

WHEREFORE, the Court should award plaintiffs compensatory, punitive and other appropriate damages; equitable relief; costs; and such other or further relief as the Court deems appropriate.

## COUNT VIII -- BREACH OF FIDUCIARY DUTY

260. Plaintiffs incorporate paragraphs 1-174 above by reference herein. This count is brought against Able Title and Urban, only.

261. At all relevant times, Able was acting as the agent of Urban, the lender, in the plaintiffs' transactions. Urban authorized and instructed Able to handle all documents, make all required disclosures, obtain the borrowers' signatures necessary to consummate the loans, and to disburse the loan proceeds properly.

262.     The actions of Able were taken with the actual and apparent authority of the lender, and thus, Urban is liable for Able's conduct.

263.     As closing agent for the lender, Able was under a duty to obtain plaintiffs' signatures on the loan documents properly, to notarize and confirm their acceptance of the transactions, and to disburse the loan proceeds properly.

264.     In agreeing to act as the closing agent for the subject mortgage loans, defendant Able also undertook the duties of an escrow agent for both parties to the loan transaction, and therefore became a fiduciary of the plaintiffs in each transaction for the purpose of making the loan disbursements.

265.     As escrow agent for the disbursement of loan funds, Able had a duty to the plaintiff-borrowersto properly disburse the loan proceeds.

266.     The loan documents, specifically the HUD-1 settlement statements, provide for certain sums to be disbursed to the plaintiffs.

267.     Able breached its fiduciary duties to plaintiffs, by making improper disbursements pursuant to fictitious letters of direction, or by making disbursements with no direction or contrary to plaintiffs' actual direction.

268.     Able wrongfully disbursed the loan proceeds to an unlicensed broker and/or contractor before any work had been done.

269.     In the alternative, Able negligently disbursed the loan proceeds to Diamond and/or United without obtaining plaintiffs' actual authority and without verifying plaintiffs' directions with respect to the funds.

270.     On information and belief, based on the fact that plaintiffs were unaware that funds would be disbursed to Diamond or United, did not have a contract with Diamond or United, and/or

did not knowingly sign any letters of direction, Able knowingly participated in the fraud, and either obtained plaintiffs' signature on purported letters of direction by deceptive means, or accepted false letters without confirming them with plaintiffs.

271.    Able also intentionally and negligently breached its duties to Urban and plaintiffs by allowing Diamond, Fefferman, and/or Both to close loans on behalf of Urban, without having an employee or representative of Able present at the closings.

272.    Plaintiffs suffered actual damages as a result of Able's breach of fiduciary duties.

WHEREFORE, plaintiffs requests that the Court enter judgment in their favor and against defendants, and award the following relief: actual damages, including but not limited to full disgorgement of all fees received by Able and restitution of all funds wrongfully disbursed, punitive damages, costs of suit, and such other and further relief as the Court deems appropriate.

Respectfully submitted,

s/Michelle A. Weinberg

Michelle A. Weinberg/ARDC  #6210390
312-347-8363
James A. Brady/ARDC #6206623
312-347-8361
LAF
120 S. LaSalle Street Suite 900
Chicago, Illinois  60603

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury.

## NOTICE OF FILING AND CERTIFICATE OF SERVICE BY ELECTRONIC MEANS

I, Michelle Weinberg, attorney for plaintiffs, hereby certify that on June _8__, 2012, filing and service of the foregoing document, was accomplished pursuant to ECF as to Filing Users, and I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

s/Michelle A. Weinberg